Juliette P. White (UT License #9616)
**PARSONS BEHLE & LATIMER**
201 South Main Street, Suite 1800
Salt Lake City, Utah 84111
Telephone:  801.532.1234
Facsimile:  801.536.6111
JWhite@parsonsbehle.com
ecf@parsonsbehle.com


Scott R. Commerson (CA License #227460)*
Daniel H. Leigh (CA License #310673)*
**DAVIS WRIGHT TREMAINE LLP**
865 South Figueroa Street, Suite 2400
Los Angeles, California 90017
Telephone:  213.633.6800
Facsimile:  213.633.6899
scottcommerson@dwt.com
danielleigh@dwt.com

Cindy L. Caditz (WA License # 16701)*
Xiang Li (WA License #52306)*
**DAVIS WRIGHT TREMAINE LLP**
920 Fifth Avenue, Suite 3300
Seattle, Washington 98104-1610
Telephone:  206.622.3150
Facsimile:  206.757.7700
cindycaditz@dwt.com
xiangli@dwt.com

* *Denotes counsel who will apply for admission
pro hac vice*

*Attorneys for Plaintiff UFirst Federal Credit Union*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UFIRST FEDERAL CREDIT UNION, <br><br> Plaintiff, <br><br> vs. <br><br> UNIVERSITY FIRST FEDERAL CREDIT UNION, <br><br> Defendant. | **COMPLAINT** <br><br> Case No. 2:22-cv-00646 <br><br> Magistrate Judge Daphne A. Oberg |

Plaintiff UFIRST FEDERAL CREDIT UNION ("Plaintiff") brings this action against Defendant UNIVERSITY FIRST FEDERAL CREDIT UNION, d/b/a UFIRST CREDIT UNION ("Defendant"), for injunctive relief and damages.

## I.    INTRODUCTION

1.    Plaintiff is a not-for-profit, community-chartered federal credit union. Plaintiff has been using the service marks UFIRST FEDERAL CREDIT UNION, UFIRST FCU, and UFIRST continually in commerce since 2006. Plaintiff's arbitrary marks combine the letter "U" and "First" into a single made-up word—UFIRST—both to recognize the credit union's origins as a university-centered institution, and to convey the message that Plaintiff exists "first and foremost for our members … for you."[1] As a not-for-profit, Plaintiff gives back any profits that it earns to its members in the form of dividends, better rates, lower fees, and more services. Plaintiff's Board of Directors is made up entirely of volunteers.

2.    Plaintiff has members in 45 states, including in Utah. While Plaintiff's physical branches are located in New York state, Plaintiff offers services nationally through its website, UFIRSTFCU.net. Plaintiff registered the domain in 2006, and the website went live by 2007. Since 2016, Plaintiff has also offered a customized UFIRST FEDERAL CREDIT UNION mobile app for its members to use for banking and other services. Through both its website and mobile app, Plaintiff offers online services, including remote deposit, bill pay, and mobile wallet, to its members around the United States. Over the past 16 years, Plaintiff has invested substantial resources to build its UFIRST brand.

3.    Plaintiff brings this action to stop the rampant confusion caused by Defendant's adoption of a nearly identical name and mark for Defendant's credit union services. In January 2022, Defendant began doing business as UFIRST CREDIT UNION, UFIRST CU, and UFIRST (collectively, the "UFIRST Trade Name"). In addition to adopting a trade name nearly identical

---

[1] https://www.ufirstfcu.net/Our-Story#Why-UFirst (accessed October 6, 2022).

to Plaintiff's, Defendant also registered and began using a new website domain, UFIRSTCU.com, that is identical to the domain for Plaintiff's website except for a single letter ("CU" rather than "FCU") and top-level domain (.com rather than .net). Defendant also purchased the domain UFIRSTCU.net so that a visitor to that domain would be redirected to Defendant's UFIRSTCU.com website. In addition, Defendant began offering a UFIRST-branded mobile app in the Apple App Store and Google Play store for its members to use for banking and other services.

4.     As credit unions, Plaintiff and Defendant offer similar services to their members and prospective members through the Internet and mobile apps. These services include remote deposit, bill pay, mobile wallet, e-statements, transferring money, sending money to individuals, applying for a loan, making loan payments, and access to money management tools.

5.     As the below images demonstrate, the similarities between Plaintiff's UFIRST logo and Defendant's infringing UFIRST logo are striking. Plaintiff's logo is Image 1 below, and Defendant's logo is Image 2.

Image 1:



Image 2:



6.      Since Defendant began using the UFIRST Trade Name, there have been ***hundreds*** of instances of actual confusion involving consumers, insurance companies, government agencies, vendors, and banks, among others. For example, consumers and businesses have misdirected checks, payments, and wire transfers to the wrong credit union (including one wire transfer in the amount of $40,000 and a separate loan payoff check for more than $60,000); consumers have unintentionally disclosed their sensitive personal information such as social security numbers or financial information to the wrong credit union; insurance companies have listed the wrong credit union as lienholder or mortgagee on insurance documents; state DMVs have listed the wrong credit union as the lienholder on vehicle titles and sent the titles to the wrong credit union; at least one vendor has sent promotional materials intended for Defendant to Plaintiff; and a brand consultant familiar with Plaintiff contacted Plaintiff believing Plaintiff was attending a conference, when, in fact, Defendant was attending the conference and the consultant was confused. Most of the known confusion is based on reporting by Plaintiff's employees, and on information and belief, discovery will show that the extent of the confusion is even greater than presently known.

7.      As a result of Defendant's conduct, Plaintiff's employees have been forced to spend hundreds of hours attempting to correct the confusion and address the disruptions caused by Defendant's infringement.

4881-8967-9415.v1

8.     Defendant's conduct constitutes knowing, intentional, and willful infringement of Plaintiff's rights. Defendant's employees have admitted that Defendant was aware of Plaintiff's trademarks before Defendant's adoption of the UFIRST Trade Name. Further, when Plaintiff brought the rampant confusion to Defendant's attention, Defendant's response was simply to minimize or dismiss it.

9.     Defendant's conduct violates federal and state law and has caused, and continues to cause, irreparable harm to Plaintiff. As remedies for these wrongs, Plaintiff seeks preliminary and permanent injunctive relief, monetary damages, disgorgement of profits, costs of suit, attorneys' fees, and other relief as set forth below.

## II.     THE PARTIES

10.     Plaintiff UFIRST FEDERAL CREDIT UNION is a federal credit union with its principal place of business at 274 Rugar Street, Plattsburgh, New York.

11.     On information and belief, Defendant UNIVERSITY FIRST FEDERAL CREDIT UNION (d/b/a UFIRST CREDIT UNION) is a federal credit union with a principal place of business at 3450 South Highland Drive, Suite 201, Salt Lake City, Utah.

## III.     JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over the Lanham Act claim in this action pursuant to 15 U.S.C. §§ 1116 and 1121 and 28 U.S.C. §§ 1331 and 1338(a).

13.     This Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. §1367 because the claims are so related to the claims in this action with the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

14.     This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332.

15.     This Court has personal jurisdiction over Defendant because it is headquartered in and maintains a principal place of business in Utah. Moreover, Defendant has knowingly and

purposefully directed infringing and unlawful activities at persons, including members, potential members, third-party service providers and businesses, and others, in Utah.

16.    Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b).

## IV.    PLAINTIFF'S RIGHTS IN THE UFIRST MARKS

17.    In 1971, the State University of New York's ("SUNY") Business & Economics Department, United University Professions, and Civil Service Employees had a vision of providing a place where the faculty and staff of SUNY Plattsburgh could save and obtain loans at fair rates, and their vision was made a reality with the creation of Plaintiff, then known as SUNY Plattsburgh Federal Credit Union.

18.    In 1973, Plaintiff moved into its first official office space. Plaintiff continued to serve the faculty and staff of SUNY Plattsburgh and various other select employee groups before becoming a community-chartered credit union and expanding its field of membership in 2002. Beginning in 2002, anyone who lived, worked, worshipped, or attended school in Clinton County, New York, as well as businesses and other organizations in Clinton County, New York and immediate family members of members, could become Plaintiff's members.

19.    After Plaintiff became a community-charted credit union, it became clear to Plaintiff's Board of Directors that, to better identify Plaintiff to members and prospective members and grow its membership, Plaintiff needed a new name. In 2006, Plaintiff adopted its current name, UFIRST FEDERAL CREDIT UNION. While the "U" represents Plaintiff's beginnings as a university-centered credit union, the combination of "U" and "First" to create the made-up word "UFIRST" was meant to reflect Plaintiff's commitment to put "first and foremost … our members … you."[2]

---

[2] https://www.ufirstfcu.net/Our-Story#Why-UFirst (accessed October 6, 2022).

20.     Indeed, as a not-for-profit, Plaintiff belongs to its members. As alleged above, Plaintiff gives any profits it earns back to its members in the form of dividends, better rates, lower fees, and more services.

21.     Since November 2006, Plaintiff has continuously used the marks UFIRST FEDERAL CREDIT UNION, UFIRST, and UFIRST FCU in commerce to offer credit union services to consumers, including banking and lending services.

22.     Since March 2018, Plaintiff also has continuously used a stylized U mark (the "U Mark") in commerce to offer credit union services to consumers, including banking and lending services. The mark consists of the letter U in a stylized form with gaps at the lower corners, as depicted below.



23.     Plaintiff's UFIRST FEDERAL CREDIT UNION, UFIRST, UFIRST FCU, and stylized U Mark are collectively referred to as the "UFIRST Marks" in this complaint.

24.     On June 26, 2006, Plaintiff registered the domain, UFIRSTFCU.net. The domain went live no later than October 2007.

25.     Since 2016, Plaintiff has made a mobile app available to members branded with some or all of the UFIRST Marks.

26.     Plaintiff offers various services through its website and mobile app, which are branded with the UFIRST Marks, including opening accounts, remote deposit of checks, electronic bill pay, mobile wallet services that substitute for payments by physical cards, e-statements, transferring money, sending money to individuals, and access to money management, loan applications, loan payments, and credit monitoring tools.

27.     Plaintiff has substantially invested in advertising using the UFIRST Marks. Plaintiff currently has an annual marketing budget over $150,000, and in addition it employs three full-time employees to conduct its marketing efforts. From 2014 to 2021, Plaintiff has invested more than $750,000 in promoting the UFIRST Marks through its website, social media, marketing emails, and other marketing and advertising efforts.

28.     On July 21, 2022, Plaintiff filed its application to register the UFIRST FEDRAL CREDIT UNION mark with the United States Patent and Trademark Office ("USPTO"). Plaintiff's application was assigned the serial number 97514431.

29.     On July 22, 2022, Plaintiff filed its application to register the U Mark with the USPTO. This application was assigned the serial number 97515892.

30.     Plaintiff's UFIRST Marks are inherently distinctive. The U Mark and the term "UFIRST" in the UFIRST Marks are fanciful, arbitrary, or at least suggestive. The term "UFIRST" and the U Mark are not generic or descriptive of credit union services.

## V.      PLAINTIFF'S NATIONWIDE PRESENCE AND EXTENSIVE ONLINE USE

31.     The market for consumer banking and lending services is national. Much of consumer banking and lending now takes place online and through mobile apps, and the move to online and mobile banking has only accelerated during the COVID-19 pandemic. Consumers of banking and lending services use the Internet and mobile apps to find and use services from banks and credit unions nationwide, rather than relying by necessity or choice on a local branch bank. A credit union member no longer needs to set foot in a brick-and-mortar branch office to open an account, deposit a check, transfer funds, arrange for direct deposit or bill pay, or review account statements.

32.     Any person who lives, works, worships, or attends school in certain counties in New York and Vermont, along with certain other groups, like Plaintiff's employees, is eligible

for membership with Plaintiff. Businesses and organizations located in the same counties may also hold membership with the Plaintiff.

33.     Immediate family members—which include spouses, children, siblings, parents, grandparents, grandchildren, stepparents, stepchildren, stepsiblings, and adoptive relationships—of Plaintiff's current members are also eligible for membership, regardless of where they live, and any current member may maintain their membership for life regardless of where they live.

34.     Because members maintain their membership after they move, and members' immediate family members are eligible to become members, Plaintiff has members spread across the United States. Plaintiff has members in 45 states, including in Utah, Colorado, Idaho, Wyoming, New Mexico, Nevada, and Arizona.

35.     Plaintiff and Defendant each offer their members "shared branching," which allows members to access services from ATMs and branch locations of other participating credit unions across the country.

36.     Plaintiff's members can access certain services through Defendant's credit union branches, and Defendant's members can access certain services through Plaintiff's credit union branches. In fact, if a user searches for "shared branch" locations on the page linked to on Defendant's website and types in the zip code 12901 (Plattsburgh, NY), ***Plaintiff's*** branches are the first three branches listed.

37.     Plaintiff has made use of the UFIRST Marks in commerce throughout the United States, including in Utah. Plaintiff currently has three members who reside in Utah. This is consistent with Plaintiff's national expansion, as members move across the country and immediate family members of members join from across the country. At least one individual currently living in Utah is a member of both Plaintiff's credit union and Defendant's credit union.

38.     As a result of Plaintiff's advertising and use of the UFIRST Marks in commerce, consumers, including consumers in Utah, have come to recognize that the UFIRST Marks indicate a source of credit union services. Consumers around the United States, including in Utah, associate the UFIRST Marks with Plaintiff's services, including online and mobile banking services, which are available to Plaintiff's members nationwide.

39.     As a result of Plaintiff's use of the UFIRST Marks, Plaintiff has obtained strong rights in the marks throughout the United States. There is significant goodwill associated with the UFIRST Marks, and they have great value as identifiers of Plaintiff's credit union services. Use of the UFIRST Marks distinguishes Plaintiff's services from the services of other credit unions.

40.     The actual confusion alleged below further confirms that consumers around the United States, including in Utah, associate the UFIRST Marks with a source of credit union services.

41.     Notwithstanding Plaintiff's longstanding rights in the UFIRST Marks, Defendant recently began unauthorized use of nearly identical variations of Plaintiff's marks. Defendant's use of UFIRST, UFIRST CREDIT UNION, and UFIRST CU infringe Plaintiff's long-established exclusive rights and harm Plaintiff and consumers.

## VI.    DEFENDANT'S INFRINGEMENT

42.     Defendant used to be a small, local credit union. It was founded in 1956 to serve the employees of the University of Utah. Defendant did not begin serving the whole of Salt Lake County until 2004, and it only began serving Davis, Utah, Wasatch, Summit, and Tooele counties, in addition to Salt Lake County, in 2020. Because of its recent and rapid expansion, Defendant now has more than 100,000 members.

43.     Like Plaintiff, Defendant offers credit union services to consumers, including banking and lending services.

44.    Until recently, Defendant did business as UNIVERSITY FIRST FEDERAL CREDIT UNION. But, in 2022, Defendant stopped competing fairly with other credit unions and began trying to profit off the goodwill associated with Plaintiff's UFIRST Marks.

45.    On August 31, 2021, Defendant applied to register a U1FIRST CREDIT UNION stylized word mark and a stylized U1 mark (collectively, "U1FIRST Marks") with the USPTO on the basis that it intended to use those marks in commerce. Plaintiff opposed Defendant's applications, and that opposition is pending.

46.    In January 2022, Defendant began using the UFIRST Trade Name and the U1FIRST Marks in commerce. Defendant uses the UFIRST Trade Name and the U1FIRST Marks extensively on its website (including in the domain name UFIRSTCU.com) and on its online and mobile banking services, which are accessible nationwide.

47.    Defendant's stylized U1FIRST CREDIT UNION mark consists of the phrase "UFIRST CREDIT UNION" in all capital letters, with the wording "CREDIT UNION" below "UFIRST" and the white space between the arms of the U in "UFIRST" forming a silhouette of the number 1. Defendant's registration application disclaimed any exclusive right to use the "CREDIT UNION" portion of the mark. The U1FIRST CREDIT UNION mark is shown as Image 2 in Paragraph 5 of this complaint.

48.    Defendant's U1FIRST CREDIT UNION mark is nearly identical to Plaintiff's UFIRST FEDERAL CREDIT UNION mark. The terms "UFIRST" and "U1FIRST" are different by only one character. The graphic rendition of the U1FIRST mark, moreover, hides the "1" in the space between the arms of the U, giving it the appearance of "UFIRST." The only other distinguishing feature between the marks is Plaintiff's use of the term "federal" to describe "credit union."

49.    Defendant's UFIRST Trade Name is also almost identical to Plaintiff's UFIRST Marks. Despite applying for a registration consisting of the word mark U1FIRST CREDIT

11

UNION, the trade name extensively used on Defendant's website and other materials omits the "1" and reads "UFIRST CREDIT UNION" or simply "UFIRST." For example, the below image appears on Defendant's UFIRSTCU.com website (accessed October 3, 2022):





50.    Defendant's U1 mark consists of a red letter U with a white number 1 framed in the space between the arms of the U. The U1 mark is also similar in appearance to Plaintiff's U Mark, particularly when combined with "FIRST." A depiction of Defendant's U1 Mark is below.



51.    Immediately after Defendant officially announced its name change in January 2022, its members reacted negatively, noting the potential for confusion. One commenter on Defendant's Facebook post announcing the rebranding noted, "The move away from 'University' is a good one, but I also think you've re-entered with a name equally confusing and unfocused." Another commenter noted, "Worst name ever. … Couldn't you be a little more original!?"

4881-8967-9415.v1

52.     Defendant now uses the UFIRST Trade Name and U1FIRST Marks to offer credit union banking and lending services to consumers in Utah and nationally through its online banking services and mobile app. Consumers can use Defendant's online banking services and mobile app from anywhere to view account balances, transfer money, pay bills, make wire transfers, and deposit checks, among other services. Defendant's mobile app and online banking services make extensive use of the UFIRST Trade Name and the U1First Marks.

53.     On information and belief, Defendant's members have used and continue to use these online and mobile app services to access credit union services while outside of Utah. Additionally, as noted above, Defendant's members can access Defendant's services nationally at "shared branching" locations run by other credit unions, including Plaintiff.

## VII.    ACTUAL CONFUSION

54.     Confusion was inevitable, given the close resemblance between Defendant's UFIRST Trade Name and U1FIRST Marks and Plaintiff's UFIRST Marks, the credit unions' overlapping services, and the fact that both credit unions conduct large portions of their business through the Internet.

55.     Since Defendant adopted its infringing name in January 2022, there have been hundreds of instances of confusion regarding the source of services offered by Plaintiff and Defendant. These instances of actual confusion involve not only scores of consumers, but also sophisticated institutional actors such as insurance companies, banks, state DMVs, and even the National Credit Union Administration ("NCUA"), the federal agency that regulates credit unions.

56.     These instances of both forward and reverse confusion represent the widespread confusion among consumers, vendors, businesses, and government agencies that Plaintiff and Defendant are affiliated or associated with each other, or that one credit union is the source of the other credit union's services.

57.     The confusion harms Plaintiff's goodwill and reputation and has serious consequences. For example, as discussed in more detail below, consumers and institutions have listed the wrong credit union on legally significant documents such as liens and titles; consumers and institutions have transmitted or disclosed sensitive personal financial information to the wrong credit union; and consumers and institutions have sent checks, payments, and wire transfers to the wrong credit union.

58.     ***Consumer confusion, including inability to access their account and related information***. On various occasions, Plaintiff has received calls from both its members and Defendant's members for help with online and mobile banking, only to find out that the member was accidentally trying to use the other credit union's website or app. Members have told Plaintiff that they downloaded Defendant's mobile banking app believing it to be Plaintiff's mobile banking app or have visited Defendant's website believing it to be Plaintiff's website. On some occasions, Plaintiff's members have reported to Plaintiff that they believed Plaintiff had rebranded.

59.     On a regular basis, consumers, including consumers in Utah, call Plaintiff for help with their accounts with Defendant or inquire about services from Defendant. Consumers have incorrectly called Plaintiff in order to, among other things, check balances on their accounts with Defendant; get help with Defendant's online banking system; verify that payments and deposits went through with Defendant; and get information about loan rates and loan payment amounts with Defendant.

60.     Plaintiff has documented dozens of calls from confused consumers since January 2022.

61.     In these calls, consumers often disclose sensitive information to Plaintiff, such as social security numbers or account numbers, erroneously believing that Plaintiff is Defendant.

62.     Consumers are not the only ones confusing Plaintiff's services and Defendant's services. Sophisticated organizations including insurance companies, other banks, and government agencies also regularly confuse Plaintiff's and Defendant's services.

63.     ***Incorrect lien and mortgage documents.*** Insurance companies including Allstate, State Farm, and others have sent Plaintiff more than 160 insurance records incorrectly listing Plaintiff as a lienholder or mortgagee when, on information and belief, Defendant was the actual lienholder or mortgagee. Almost all of these liens and mortgages are for property in Utah and automobiles owned by Utah consumers.

64.     In one incident in July 2022, an automobile dealer erroneously perfected a lien on a car loan to a consumer in Utah for Plaintiff, when, on information and belief, the dealer intended to perfect the lien for Defendant. Realizing the mistake, the dealer emailed Plaintiff to request a notarized lien release to correct the mistake.

65.     Plaintiff also has received numerous calls from automobile dealers seeking 10-day payoffs on car loans for consumers in Utah when, on information and belief, Defendant generated the loans.

66.     ***Incorrect automobile titles.*** On at least eight occasions, state DMVs, including the Utah DMV, have sent automobile titles to Plaintiff that incorrectly list Plaintiff as the lienholder when, on information and belief, the actual or intended lienholder was Defendant. When this occurs, Plaintiff transmits the titles to Defendant, and, in response, Defendant has asked Plaintiff to also include signed lien releases with those titles (despite the fact that Plaintiff does not have a lien on those titles and cannot release liens it does not hold).

67.     ***Misdirected attempts to verify funds or transactions.*** Even other banks confuse Plaintiff's services and Defendant's services. In one instance in July 2022, a bank called Plaintiff to verify funds for a check written by a person who was not Plaintiff's member but, instead, on information and belief, was Defendant's member. In February 2022, a Capital One employee

called Plaintiff seeking to verify a payment taken out of the account of a person who was not Plaintiff's member but who, on information and belief, was Defendant's member. Also in February 2022, an employee of another credit union called Plaintiff asking for information about a transaction that had occurred at a branch location in Utah that, on information and belief, was one of Defendant's branches.

68.     ***Misdirected transfer of funds.*** The confusion between Plaintiff and Defendant has also resulted in consumers and businesses directing payments, checks, and wire transfers to the incorrect credit union.

69.     For example, in September 2022, Plaintiff received a loan payment through its online payment system from an individual who did not have a loan from Plaintiff. The individual listed a phone number with a Utah area code. On information and belief, the individual had a loan with Defendant and was attempting to make a payment on that loan. Plaintiff refunded the payment.

70.     In another incident in April 2022, one of Plaintiff's members reported to Plaintiff that he had not received his paycheck via direct deposit. After talking with one of Plaintiff's member service representatives, the member realized that he had looked up what he thought was Plaintiff's routing number on what he thought was Plaintiff's website, but was actually Defendant's website. Plaintiff's member had therefore given his employer Defendant's routing number rather than Plaintiff's, and as a result, had not received his paycheck.

71.     In May 2022, Plaintiff received a $40,000 wire transfer intended for an individual who was not Plaintiff's member and was based in Colorado. Plaintiff declined the wire transfer. On information and belief, the wire transfer was intended for one of Defendant's members.

72.     In July 2022, Plaintiff received a $63,587.61 loan payoff check made out to Defendant from an automobile dealer. On information and belief, the check was intended for a member of Defendant's credit union.

4881-8967-9415.v1

73.    ***The Impact of Confusion on Plaintiff.*** Plaintiff, a small credit union with approximately 30 employees, has been forced to expend significant time and resources in an attempt to address and correct the confusion and disruption that Defendant's infringement has caused. Plaintiff's employees spend many hours on the phone with confused consumers and on calls with insurance companies and other institutions trying to correct the institutions' records and mistakes. Since January 2022, Plaintiff's employees have spent in excess of 500 hours dealing with this confusion. This has caused serious disruptions to Plaintiff's operations and efficiency.

74.    Complaints about Defendant are also mistakenly attributed to Plaintiff. For example, the NCUA, the federal agency that regulates credit unions, has confused Plaintiff and Defendant. On a date unknown to Plaintiff, a consumer submitted a complaint to the NCUA, claiming that his account with "UFirst Credit Union (Formally known as University First Federal Credit Union)" had been improperly charged overdraft fees. While the consumer's complaint was about the alleged conduct of Defendant, the NCUA sent the complaint to Plaintiff.

75.    Confusion of Defendant with Plaintiff could thus have a significant impact on Plaintiff's reputation. For example, if Defendant suffered a data breach or incident of fraud and that incident were erroneously attributed to Plaintiff, it would seriously harm Plaintiff's reputation.

## VIII.    DEFENDANT'S INTENTIONAL INFRINGEMENT

76.    When Plaintiff first reported the initial instances of confusion to Defendant in January and February of 2022, two employees of Defendant stated that Defendant was aware of Plaintiff's use of the UFIRST Marks when Defendant decided to adopt the UFIRST Trade Name and U1FIRST Marks.

77.    Defendant is also well aware of the actual confusion that has resulted from their adoption of the UFIRST Trade Name and U1FIRST Marks. For example, when Plaintiff

17

incorrectly receives a vehicle title intended for Defendant, Plaintiff mails the title to Defendant. As noted above, in response, Defendant has asked Plaintiff to also include signed lien releases with those titles (despite the fact that Plaintiff does not have a lien on those titles and cannot release liens it does not hold).

78.    On August 5, 2022, Plaintiff sent a cease and desist letter to Defendant detailing Defendant's infringement and the consumer confusion Defendant had caused. Despite that letter, Defendant refused to cease use of its infringing name and marks. In its response to Plaintiff's letter, Defendant brushed off the actual confusion that had been brought to its attention as "instances of harmless mistake."

79.    By continuing to use the UFIRST Trade Name and U1FIRST Marks, Defendant is willfully and intentionally causing a likelihood of confusion (and actual confusion) as to the affiliation, connection, or association of Plaintiff with Defendant and vice versa and as to the origin, sponsorship, or approval by Plaintiff of Defendant's services and commercial activities, and by Defendant of Plaintiff's services and commercial activities.

80.    On information and belief, Defendant's use of the UFIRST Trade Name and U1FIRST Marks may cause Plaintiff to lose actual and prospective members and damages Plaintiff's business reputation and the goodwill associated with the UFIRST Marks.

81.    Defendant's actions described in this complaint have also caused irreparable injury to Plaintiff. An award of monetary damages alone cannot fully compensate Plaintiff for its injuries, and Plaintiff lacks an adequate remedy at law. Plaintiff has suffered and will continue to suffer a substantial loss of  members, goodwill, and reputation unless and until Defendant is enjoined from its wrongful actions and infringement, as set forth below.

4881-8967-9415.v1

# VI.  CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
### False Designation of Origin – Lanham Act (15 U.S.C. § 1125(a))

82.    Plaintiff incorporates by reference the allegations of each and every one of the preceding paragraphs as though fully set forth herein.

83.    Plaintiff owns the UFIRST Marks and the exclusive right to use the marks in connection with credit union services nationwide and on the internet, including in Utah. Plaintiff uses the UFIRST Marks in connection with its commercial offering of credit union services to its members nationwide, including in Utah. Plaintiff has been using the UFIRST Marks in this way and in these areas since before Defendant began using the UFIRST Trade Name and U1FIRST Marks in commerce. Plaintiff has never abandoned or stopped its uses of the UFIRST Marks.

84.    The UFIRST Marks are inherently distinctive and have also acquired secondary meaning as a source of credit union services nationwide and on the internet, including in Utah. Plaintiff has also invested substantial resources to advertise and market using the UFIRST Marks. This secondary meaning developed before Defendant began using the UFIRST Trade Name and U1FIRST Marks in commerce. Plaintiff is the senior user of the UFIRST Marks nationwide and on the internet, including in Utah, and possesses rights to use the mark superior to any rights possessed by Defendant.

85.    Defendant's UFIRST Trade Name and U1FIRST Marks are confusingly similar to the UFIRST Marks.

86.    Defendant is making commercial use of the UFIRST Trade Name and U1FIRST Marks in a manner that is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Plaintiff with Defendant and vice versa, and as to the origin, sponsorship, or approval by Plaintiff of Defendant's services and commercial activities and by Defendant of Plaintiff's services and commercial activities. Defendant's use of the

19

UFIRST Trade Name and U1FIRST Marks has actually caused such confusion on hundreds of occasions.

87.    Plaintiff has never given Defendant permission to use the UFIRST Trade Name and U1FIRST Marks.

88.    Defendant's unauthorized use of a trade name and marks confusingly similar to the UFIRST Marks is willful and done with knowledge of Plaintiff's rights in the UFIRST Marks and actual consumer confusion that has occurred. On information and belief, Defendant acted with the intent to trade on Plaintiff's reputation and goodwill by causing confusion among consumers as to the source of Plaintiff's and Defendant's respective credit union services.

89.    On information and belief, Defendant's use of the UFIRST Trade Name and U1FIRST Marks may cause Plaintiff to lose actual and prospective members and damages Plaintiff's business reputation and the goodwill associated with the UFIRST Marks.

90.    As a result of Defendant's actions described in this complaint, Plaintiff is entitled all remedies available under the Lanham Act, 15 U.S.C. § 1125(a)(1)(A), including, but not limited to, compensatory damages, including treble damages, disgorgement of profits, costs of suit and, because this is an exceptional case, attorneys' fees.

91.    Defendant's actions cause irreparable injury to Plaintiff's goodwill and reputation. An award of monetary damages alone cannot fully compensate Plaintiff for its injuries, and Plaintiff lacks an adequate remedy at law. As a result, Plaintiff is entitled to a preliminary and permanent injunction, as set forth below.

**SECOND CLAIM FOR RELIEF**
**Common Law Trademark Infringement**

92.    Plaintiff incorporates by reference the allegations of each and every one of the preceding paragraphs as though fully set forth herein.

93.    Plaintiff owns the UFIRST Marks and the exclusive right to use the marks nationwide in connection with credit union services, including in Utah. Plaintiff uses the

20

UFIRST Marks in connection with its commercial offering of credit union services to its members nationwide and on the internet, including in Utah. Plaintiff has been using the UFIRST Marks in this way and in these areas since before Defendant began using the UFIRST Trade Name and U1FIRST Marks in commerce. Plaintiff has never abandoned or stopped these uses of the UFIRST Marks.

94.     The UFIRST Marks are inherently distinctive and have also acquired secondary meaning as a source of credit union services nationwide and on the internet, including in Utah. Plaintiff has extensively used the UFIRST Marks nationwide and on the internet, including in Utah. This secondary meaning developed before Defendant began using the UFIRST Trade Name and U1FIRST Marks in commerce. Plaintiff is the senior user of the UFIRST Marks nationwide and on the internet, including in Utah, and possesses rights to use the mark superior to any rights possessed by Defendant.

95.     As a result of these activities, Plaintiff has obtained common law rights to exclusive use of the UFIRST Marks nationwide and on the internet, including in Utah.

96.     Defendant's UFIRST Trade Name and U1FIRST Marks are confusingly similar to the UFIRST Marks.

97.     Defendant is making commercial use of the UFIRST Trade Name and U1FIRST Marks in a manner that is likely to cause confusion, to cause mistake, or to deceive as to the affiliation, connection, or association of Plaintiff with Defendant and vice versa, and as to the origin, sponsorship, or approval by Plaintiff of Defendant's services and commercial activities and by Defendant of Plaintiff's services and commercial activities. Defendant's use of the UFIRST Trade Name and U1FIRST Marks has caused such confusion.

98.     Plaintiff has never given Defendant permission to use the UFIRST Trade Name and U1FIRST Marks.

99.     Defendant's activities constitute common law trademark infringement.

100.    Defendant's unauthorized use of a trade name and marks confusingly similar to the UFIRST Marks is willful and done with knowledge of Plaintiff's rights in the UFIRST Marks and actual consumer confusion that has occurred. On information and belief, Defendant acted with the intent to trade on Plaintiff's reputation and goodwill by causing confusion among consumers as to the source of Plaintiff's and Defendant's respective credit union services.

101.    On information and belief, Defendant's use of the UFIRST Trade Name and U1FIRST Marks may cause Plaintiff to lose actual and prospective members, and damages Plaintiff's business reputation and the goodwill associated with the UFIRST Marks.

102.    As a result of Defendant's actions described in this complaint, Plaintiff is entitled to recover from Defendant compensatory damages, profits from Defendant's infringing sales, and, due to the intentional and willful nature of the infringement, exemplary and punitive damages.

103.    Defendant's actions are causing irreparable injury to Plaintiff's goodwill and reputation. An award of monetary damages alone cannot fully compensate Plaintiff for its injuries, and Plaintiff lacks an adequate remedy at law. As a result, Plaintiff is entitled to a preliminary and permanent injunction, as set forth below.

### THIRD CLAIM FOR RELIEF
### Common Law Unfair Competition, Deceptive Advertising, and Unfair Trade Practices

104.    Plaintiff incorporates by reference the allegations of each and every one of the preceding paragraphs as though fully set forth herein.

105.    Through its actions described above, including its infringing use of the UFIRST Trade Name and U1FIRST Marks in commerce nationwide and on the internet, including in Utah, Defendant is engaged in passing off, palming off, imitating, and/or causing or likely causing confusion, deception or mistake, and unfairly competing at common law as it relates to Plaintiff's UFIRST Marks.

4881-8967-9415.v1

106.    Through its infringing use of the UFIRST Trade Name and U1FIRST Marks, Defendant is passing off its services and goods to members and others as if they were the services and goods of Plaintiff, with Defendant creating forward confusion and reverse confusion as to source, origin, sponsorship, approval and affiliation among members, potential members, third party service providers and businesses, and others relating to the parties, their marks, and services and goods.

107.    Through its actions as described above, including its infringing use of the UFIRST Trade Name and U1FIRST Marks, Defendant is engaged in making false and deceptive statements concerning the source, origin or affiliation of Defendant and its services, and is engaged in such actions to unfairly benefit from Plaintiff's marks and the goodwill therein.

108.    Defendant's actions constitute unfair competition, deceptive advertising, and unfair practices prohibited by common law in Utah and beyond, including by impairment of the ability of members to identify the commercial source of Plaintiff's services, and by misappropriation of Plaintiff's labors and expenditures in violation of common law.

109.    Defendant's actions have caused Plaintiff damages in an amount to be proven at trial with Plaintiff entitled to recovery for the same.

110.    Plaintiff is also entitled to Defendant's profits from infringing sales.

111.    Plaintiff is being irreparably harmed by Defendant's infringement. Plaintiff has no adequate remedy at law. Plaintiff is therefore entitled to a preliminary and permanent injunction barring Defendant from engaging in further acts of unfair competition.

112.    Plaintiff is entitled to a court order requiring the destruction and/or impoundment of all infringing materials and other relief as provided at common law.

113.    Based on the foregoing, Plaintiff is entitled to declaratory, injunctive and monetary relief against Defendant, along with its attorneys' fees and costs. Defendant's actions were willful and malicious or intentionally fraudulent conduct, and/or manifest a knowing and

reckless indifference toward, and a disregard of, the rights of Plaintiff. Plaintiff is therefore entitled to an award of exemplary and punitive damages against Defendant.

## FOURTH CLAIM FOR RELIEF
### Unjust Enrichment

114.    Plaintiff incorporates by reference the allegations of each and every one of the preceding paragraphs as though fully set forth herein.

115.    Defendant has benefited from the improper, unfair, and unauthorized use, misappropriation, and infringement of Plaintiff's UFIRST Marks and goodwill attendant thereto, as alleged above.

116.    Defendant has knowledge of, and fully appreciates, the improper, unfair and unauthorized benefits it has received from Plaintiff as a result of such actions.

117.    Defendant would be unjustly enriched if it were permitted to retain the proceeds and the benefits obtained from such actions.

118.    Equity and good conscience dictate that Defendant be required to account for and turn over to Plaintiff an amount equal to the value of the benefits involuntarily conferred upon it.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests judgment as follows:

1.    That the Court render final judgment in favor of Plaintiff and against Defendant on all claims for relief alleged in this complaint;

2.    That the Court issue preliminary and permanent injunctive relief against Defendant and that Defendant, its officers, agents, representatives, servants, employees, attorneys, successors and assigns, and all others in active concert or participation with Defendant, be enjoined and ordered to:

(a)    Immediately stop all direct or indirect use in commerce, promotion, advertisement, reproduction, display, offering for sale, sale, or distribution of the UFIRST Trade

Name and U1FIRST Marks, or any name or mark confusingly similar to Plaintiff's UFIRST Marks, in all mediums including but not limited to visual media, signs, promotional material, print media, social media, and online use;

   (b) Deliver up and destroy all labels, signs, prints, packages, wrappers, receptacles, internet posts, advertisements, swag, apparel, and other material in the possession of Defendant bearing the UFIRST Trade Name and U1FIRST Marks, or any term confusingly similar to the UFIRST Marks;

   (c) Take all steps necessary to cancel or otherwise withdraw any and all federal, state, or local registrations and applications, including registrations and applications relating to trademarks, service marks, trade names, corporate names, assumed names, internet domain names, related to use in commerce of the UFIRST Trade Name and U1FIRST Marks or any name or mark confusingly similar to the UFIRST Marks;

   3. That the Court enter an Order instructing Defendant to promulgate advertising to correct and/or prevent any member, potential member, supplier, vendor, agency or other confusion or false association it has created or made in the marketplace.

   4. That the Court enter an Order instructing Defendant to file with the Court and serve on Plaintiff within thirty days after the service of any injunction order and any other order, a report in writing, under oath, setting forth in detail the manner and form in which Defendant has complied with all elements of the injunction and order.

   5. That the Court enter an Order requiring an accounting of all profits received, directly or indirectly, from or through Defendant's acts of infringement, unfair competition and other violations set forth above, and that such profits be trebled or otherwise enhanced including with interest pursuant to applicable federal and state law, including, without limitation, as noted above.

4881-8967-9415.v1

6.  That the Court enter an Order instructing Defendant to pay Plaintiff's general, special, and actual damages, including treble damages pursuant to the Lanham Act and exemplary and punitive damages;

7.  That the Court order Defendant to pay Plaintiff both the costs of this action and attorneys' fees incurred in prosecuting this action;

8.  That the Court order Defendant to pay Plaintiff pre-judgment interest at the rate established under 26 U.S.C. § 6621(a)(2) from the date of service of the Complaint through the date of judgment, and such additional pre-judgment interest and post judgment interest as otherwise permitted by law; and

9.  That the Court grant Plaintiff such additional and further relief as the Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff demands a trial by jury for all issues so triable.

DATED October 6, 2022.

/s/ Juliette P. White
Juliette P. White
PARSONS BEHLE & LATIMER

Scott R. Commerson
Cindy L. Caditz
Xiang Li
Daniel H. Leigh
DAVIS WRIGHT TREMAINE LLP

*Attorneys for Plaintiff UFirst Federal Credit Union*

4881-8967-9415.v1

## **CERTIFICATE OF SERVICE**

I hereby certify that I electronically filed the foregoing document with the Clerk of the Court by using the CM/ECF system, and that service will be accomplished on all counsel and persons requesting notice by the Court CM/ECF system, which will send notification of such filing to their email addresses.

/s/ Juliette P. White

4881-8967-9415.v1