IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF UTAH

| | |
|---|---|
| UFIRST FEDERAL CREDIT UNION,<br><br>   Plaintiff,<br><br>v.<br><br>UNIVERSITY FIRST FEDERAL CREDIT<br>UNION d/b/a UFIRST CREDIT UNION,<br><br>   Defendant. | MEMORANDUM DECISION AND ORDER<br>DENYING MOTION FOR PRELIMINARY<br>INJUNCTION<br><br><br>Case No. 2:22-cv-00646-JNP-JCB<br><br>District Judge Jill N. Parrish |

Before the court is plaintiff UFirst Federal Credit Union's (UFirst NY) motion for a preliminary injunction against defendant University First Federal Credit Union d/b/a UFirst Credit Union (UFirst UT). ECF No. 13. The court DENIES the motion.

## BACKGROUND

The court held an evidentiary hearing for the preliminary injunction and received witness testimony. Both during and after the hearing, the parties proffered documents for the court's consideration. Based on the testimony and exhibits presented, the court makes the following findings of fact.

    *A.    UFirst NY*

UFirst NY is a credit union founded in Plattsburgh, New York in 1971. It was originally named SUNY Plattsburgh Federal Credit Union and served the faculty and staff of the State University of New York at Plattsburgh. In 2002, it amended its charter to permit any member of the community to join. Under the amended charter, new members must live, work, worship, or attend school in one of five counties: Clinton, Essex, and Franklin Counties of New York and

Franklin and Grand Isle Counties of Vermont. In 2006, SUNY Plattsburgh Federal Credit Union decided to change its name to dispel the misconception that individuals had to work for SUNY Plattsburgh in order to become a member. It began doing business under the name UFirst Federal Credit Union. UFirst NY did not register its new service mark.

Once an individual becomes a member of UFirst NY, he or she retains membership for life. Over time, UFirst NY members moved from New York and Vermont to other states. Five UFirst NY members currently live in Utah. For most of these members, there is no evidence that they continued to use UFirst NY's services after they moved to this state. But UFirst NY provided banking records showing that three of its members that moved to Utah within the last ten years used its services while in the state.

Member Number One moved to Magna, Utah sometime in mid-2012. In October 2012, Member One began to use a debit card—presumably branded with the UFirst NY name and logo—to make purchases at businesses located in Utah. With the exception of a notable gap in time,[1] Member One made around six to ten debit card purchases per month at Utah businesses until December 3, 2013—the date of the last Utah debit card transaction. Thereafter, most of the debit card purchases were made in Plattsburgh, indicating that Member One had moved back to Upstate New York.

Member Number Two moved to Provo, Utah in mid-2016. Around September 2016, Member Two moved to Orem, Utah. Unlike Member One, the records provided by UFirst NY indicate that Member Two did not make debit card purchases in Utah. But bank records indicate

---

[1] From July 20, 2013 through September 22, 2013, Member One made debit card transactions in the Plattsburgh area, indicating that the member had moved back to Upstate New York for a two-month period of time.

that Member Two used a UFirst NY debit card to withdraw cash from ATMs located in Provo or Orem in June 2017, in October 2017, and December 2018. There are no records of any transactions in Utah after December 2018. While she lived in Utah, Member Two transferred funds from her UFirst NY account to pay her electricity, gas, rent, and credit card bills, as well as to make student loan payments. But the account records provided to the court do not indicate whether Member Two visited UFirst NY's website or used its mobile app to initiate these transactions.

Member Number Three moved to Layton, Utah in November 2021. Account records indicate that this member first used a UFirst NY branded debit card in Utah by completing a $16.61 purchase in a sandwich shop around November 13, 2021. Thereafter, Member Three continued to use a UFirst NY debit card a few times a week to make purchases from businesses located in Utah. Member Three also direct-deposited paychecks into the account and withdrew cash in Utah through a local credit union that participated in a shared branch agreement with UFirst NY. Member Three also withdrew and deposited money through a Venmo mobile app, which was linked to his UFirst NY account. Member Three continued to use a UFirst NY debit card to make purchases in Utah through January 2023.

B.    *UFirst UT*

UFirst UT is a credit union founded in Salt Lake City, Utah in 1956. Initially named The University of Utah Employees Credit Union, it provided banking services to employees of the university.  In 2004, it expanded its field of membership to include anyone who lives, works, goes to school, worships, or volunteers in one of six Utah counties: Salt Lake, Utah, Davis, Wasatch, Toole, and Summit counties. In 2009, it changed its name to University First Federal Credit Union.

In 2020, the credit union began the process of selecting a new name to better reflect its expanded field of membership. It decided to change its name to UFirst Credit Union. While

conducting due diligence for the name change, UFirst UT became aware of UFirst NY. Because UFirst NY had not registered its service mark and its field of membership was confined to five counties in Upstate New York and Vermont, UFirst UT believed it could adopt a similar service mark without infringing UFirst NY's service mark rights. On August 31, 2021, UFirst UT applied to register this new service mark with the United States Patent and Trademark Office. On January 18, 2022, UFirst UT publicly announced the name change and launched an extensive rebranding campaign to inform its current members and potential customers. UFirst UT expended a substantial amount of money in Utah to advertise its new name.

Similar to UFirst NY, UFirst UT members retain membership for life, even if they move away from the six Utah counties where UFirst UT operates. Members that move away from this region may continue to use UFirst UT's financial services through its online tools. About 1,100 UFirst UT members have moved to eight states in the Northeast: Connecticut, Massachusetts, Maine, New Hampshire, New Jersey, New York, Pennsylvania, and Vermont. Of that total, 330 moved to the states of New York and Vermont. But only one UFirst UT member moved to Plattsburg, New York, where UFirst NY operates. It is unclear which of the UFirst UT members who moved to the Northeast continued to use UFirst UT's financial services.

C.    *Confusion*

Both UFirst NY and UFirst UT permit their members to access banking services online through websites and apps for mobile devices. UFirst NY's web address is https://ufirstfcu.net, while the web address adopted by UFirst UT is https://www.ufirstcu.com. An internet search for the term "UFirst" yields, in close proximity to each other, results that include both the UFirst NY and UFirst UT websites. Searches on app stores for "UFirst" also return results for both the UFirst NY and UFirst UT mobile apps.

As a result, some consumers became confused when attempting to access online banking services after UFirst UT adopted its new name. Some of UFirst NY's members contacted its customer service representatives when they were unable to access their accounts because they were using the UFirst UT website or mobile app. On other occasions, UFirst UT members would call UFirst NY for help because they had mistakenly attempted to use UFirst NY's website or mobile app to access their bank accounts. This confusion caused some customer frustration and occupied the time of UFirst NY's customer service representatives. UFirst also points to negative internet reviews for UFirst UT branch locations that could potentially taint the UFirst NY brand in the eyes of consumers.

The similarity between the service marks used by UFirst NY and UFirst UT also lead to other problems. Sometimes members of these credit unions would obtain incorrect routing numbers through internet searches, leading to delays in setting up payroll deposits and completing money transfers. UFirst UT members mistakenly sent loan payments to UFirst NY. Insurance companies contacted UFirst NY for payoff information for UFirst UT loans. Insurance companies also erroneously listed UFirst NY as the lienholder, mortgagee, or interested party for property or vehicles owned by UFirst UT members. Moreover, parties would sometimes send vehicle titles to UFirst NY for loans originated by UFirst UT.

D.    *Procedural History*

Soon after UFirst UT publicly announced its new service mark on January 18, 2022, UFirst NY learned of the name change. On October 6, 2022, UFirst NY sued UFirst UT. UFirst NY alleged that UFirst UT had infringed its service mark rights. Soon thereafter, UFirst NY filed the instant motion for a preliminary injunction. The precise scope of the injunction sought is not explicitly laid out. But UFirst NY appears to seek a nation-wide injunction prohibiting UFirst UT

5

from using its new service mark anywhere in the United States or on the internet. UFirst NY further argues that the court should not require a bond prior to issuing a preliminary injunction.

## LEGAL STANDARD

To obtain a preliminary injunction, the moving party must establish: "(1) a substantial likelihood of success on the merits; (2) irreparable harm to the movant if the injunction is denied; (3) the threatened injury outweighs the harm that the preliminary injunction may cause the opposing party; and (4) the injunction, if issued, will not adversely affect the public interest." *Gen. Motors Corp. v. Urban Gorilla, LLC*, 500 F.3d 1222, 1226 (10th Cir. 2007). "[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion." *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (citation omitted); *accord Schrier v. Univ. of Colo.*, 427 F.3d 1253, 1258 (10th Cir. 2005) ("As a preliminary injunction is an extraordinary remedy, the right to relief must be clear and unequivocal." (Citation omitted)).

While any preliminary injunction is an extraordinary remedy, the Tenth Circuit has identified three types of injunctions that are particularly disfavored: "(1) preliminary injunctions that alter the status quo; (2) mandatory preliminary injunctions; and (3) preliminary injunctions that afford the movant all the relief that it could recover at the conclusion of a full trial on the merits." *State v. U.S. Env't Prot. Agency*, 989 F.3d 874, 883–84 (10th Cir. 2021) (citation omitted). These disfavored injunctions "must be more closely scrutinized to assure that the exigencies of the case support the granting of a remedy that is extraordinary even in the normal course." *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 975 (10th Cir. 2004) (en banc). Accordingly, "a party seeking [a disfavored] injunction must make a strong showing both with regard to the likelihood of success on the merits and with regard to the balance of harms." *Id.* at

976. UFirst NY does not contest that it seeks a disfavored injunction. Thus, in addition to carrying the standard burden of persuasion by a clear showing, UFirst NY must also satisfy the heightened standard required for disfavored injunctive relief.

## ANALYSIS

UFirst NY asserts four claims against UFirst UT: (1) Lanham Act trademark[2] infringement, (2) common law trademark infringement, (3) common law unfair competition, and (4) unjust enrichment. Conceding that the fate of its other claims turns on whether it succeeds on its Lanham Act claim, UFirst NY bases its motion for a preliminary injunction on its federal trademark infringement claim. *See Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1046 (10th Cir. 2021) ("Federal and state trademark protections generally parallel each other . . . ."). Thus, the first step in determining whether UFirst NY is entitled to injunctive relief is to decide whether it has made a strong showing that it will prevail on its Lanham Act claim.

UFirst NY has not clearly defined the scope of the injunction it seeks against UFirst UT. Because UFirst NY's briefing suggests that it seeks a nation-wide injunction, the court first analyzes whether it has shown a strong likelihood of success on a claim for such an injunction. Because the court finds that UFirst NY has not cleared this bar, the court then analyzes whether it has shown a strong likelihood of success on infringement claims for two regions of the United States: (1) Utah and (2) eight states in the Northeast. Finally, the court addresses UFirst NY's

_____

[2] Because UFirst NY is in the business of providing financial services, the mark at issue in this case is a service mark. The court, however, frequently uses the term "trademark" in this order when discussing the law because it is generally understood to encompass both trademarks and service marks. *See Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1045 n.1 (10th Cir. 2021).

contention that this court should not require a bond as a condition for granting a preliminary injunction.

## I.      CLAIM FOR A NATION-WIDE INJUNCTION

"The foundation of current federal trademark law is the Lanham Act . . . ." *Matal v. Tam*, 582 U.S. 218, 224 (2017). This Act provides a method for registering trademarks that are used in commerce. *Id.* at 224–25. But "even if a trademark is not federally registered, it may still be enforceable under § 43(a) of the Lanham Act [15 U.S.C. § 1125(a)], which creates a federal cause of action for trademark infringement." *Id.* at 225. "To prevail under Section 43(a), a plaintiff must show '(1) that the plaintiff has a protectable interest in the mark; (2) that the defendant has used an identical or similar mark in commerce; and (3) that the defendant's use is likely to confuse customers.'" *Underwood v. Bank of Am. Corp.*, 996 F.3d 1038, 1052 (10th Cir. 2021) (citation omitted).

The owner of an unregistered trademark, however, does not automatically obtain exclusive, nationwide rights to the mark. "The common law has long recognized that 'the national senior user of a mark cannot oust a geographically remote good-faith user who has used the mark first in a remote trade area.'" *GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990); *see also Value House v. Phillips Mercantile Co.*, 523 F.2d 424, 431 (10th Cir. 1975); *Dudley v. Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012) ("A user of a mark who does not seek federal registration risks the possibility that another user will independently adopt the same mark and establish exclusive rights to use the mark in a remote area."). Thus, a junior user of a trademark may establish a defense to trademark infringement if the junior user can show that (1) it adopted the trademark in good faith and (2) it uses the trademark in a geographically remote market. *GTE*, 904 F.2d at 541–42.

UFirst NY, which began using the UFirst service mark in 2006, is the undisputed senior user of the mark. But in order to show that it will likely prevail on its claim to nation-wide rights to its unregistered mark that are superior to any rights that UFirst UT may have, it must demonstrate either that UFirst UT did not adopt its mark in good faith or that UFirst NY had penetrated all of the potential markets in the United States before UFirst UT began using the service mark.

### A.  Good Faith

UFirst UT concedes that it learned of the existence of UFirst NY between January and April of 2021, while it was conducting due diligence for its anticipated name change. Thus, between nine and twelve months before UFirst UT informed the public of its name change, it discovered that another credit union was going by a similar name. But UFirst UT believed that it could move forward with the planned name change because UFirst NY had not registered its trademark with the USPTO and its field of membership was confined to individuals who had ties to five counties in Upstate New York and Vermont, thousands of miles from Northern Utah where UFirst UT operates.

Based on the facts of this case, the court finds that UFirst NY has not made a strong showing that it will likely prove that UFirst UT acted in bad faith in selecting its new name. "While a subsequent user's adoption of a mark with knowledge of another's use can certainly support an inference of bad faith, mere knowledge should not foreclose further inquiry. The ultimate focus is on whether the second user had the intent to benefit from the reputation or goodwill of the first user." *GTE*, 904 F.2d at 541 (citations omitted). Here, there is little evidence that UFirst UT adopted its new name with the intent of benefitting from the goodwill of UFirst NY, which had a field of membership limited to sections of Upstate New York and Vermont. Recently, the Tenth

9

Circuit has concluded that Elevate Federal Credit Union, which is based in three rural counties in northern Utah, did not act in bad faith when it adopted a name similar to Elevations Credit Union, which operates in Colorado, despite prior knowledge of the Colorado credit union's name. *Elevate Fed. Credit Union v. Elevations Credit Union*, 67 F.4th 1058, 1079–80 (10th Cir. 2023) *aff'g*, No. 1:20-cv-00028-DAK-JCB, 2022 WL 798901, at *18–19 (D. Utah Mar. 16, 2022) (ruling that the Utah credit union did not act in bad faith in part because the Utah credit union and the Colorado credit union had geographically distinct customer bases). In this case, UFirst UT has a stronger argument that it did not intend to benefit from the goodwill of a credit union that is much more geographically remote. Indeed, because UFirst UT and UFirst NY may only recruit new members from their respective geographic regions, UFirst would derive almost no benefit from the good will associated with UFirst NY's service mark in Upstate New York and Vermont. Moreover, UFirst UT's expenditure of millions of dollars for advertising in Utah to promote its new name also suggests that it did not intend to benefit from the reputation of UFirst NY. See *Elevate Fed. Credit Union*, 67 F.4th 1058 at 1080 (holding that a Utah credit union's expenditure of hundreds of thousands of dollars to develop and promote its service mark indicated that it did not intend to rely on the reputation of a Colorado credit union).

Thus, based on the evidence presented to the court, UFirst NY has not met its burden of showing that it will likely prevail on the good faith prong of the remote user defense.

B.    *Geographically Remote Market*

In addition to good-faith adoption, a junior user of a service mark must also show that it uses the mark in a market that is geographically remote to markets where the senior user has established rights through prior use. UFirst NY has not engaged in the labor-intensive exercise of conducting a market-by-market analysis to determine every region in the United States for which

10

it has superior rights to the UFirst service mark. Instead, UFirst NY argues that because it provides banking services through its website and a mobile app, its service mark has a nation-wide reach.

But evidence that UFirst NY operates a website or a mobile app with the potential to provide nation-wide reach is not sufficient, in itself, to establish nation-wide trademark rights. The Tenth Circuit has noted that "trademark rights 'are fundamentally geographical.'" *Hetronic Int'l, Inc. v. Hetronic Germany GmbH*, 10 F.4th 1016, 1046 (10th Cir. 2021) (citation omitted). Accordingly, the owner of either a registered or unregistered trademark "is not entitled to injunctive relief *except in the area actually penetrated through use of the mark*." *Id.* (citation omitted). Evidence that a trademark is used on the internet is not sufficient to show that a particular market has been penetrated through use:

> Merely being the senior user of a mark on the internet does not thereby create an exclusive right to the mark for internet use in all territories of the United States (or the world). The internet (or cyberspace) is not a "territory." As Judge Telesca observed: "[P]laintiff assumes that the internet is a territory in which he can establish exclusive rights. The internet is not, however, a geographic territory to be subdivided; instead, it is a global communication medium that is accessible from anywhere on the planet."

5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:30.50 (5th ed. 2023) (quoting *Dudley*, 883 F. Supp. 2d at 394). In other words, "operating a website available on the Internet is not equivalent to use in United States commerce." *Schreiber v. Dunabin*, 938 F. Supp. 2d 587, 598 (E.D. Va. 2013) *cited with approval in Underwood*, 996 F.3d at 1054. Instead, "Market penetration by internet use of a mark should be determined, primarily by evidence as to the place where buyers actually purchased the goods and services advertised on the internet site." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:30.50.

In short, UFirst NY may not rely on the fact that it operates a website and a mobile app to establish nation-wide rights to its trademark. *See Hanginout, Inc. v. Google, Inc*., 54 F. Supp. 3d 1109, 1124 (S.D. Cal. 2014) ("[T]he Court does not agree with [the plaintiff] that marketing, advertising, and promoting an unregistered mark over the Internet is sufficient to find nationwide market penetration."). Nor has UFirst NY gone to the effort of proving that it has penetrated every market in the United States though use of its trademark within each market—either through use of the UFirst NY website or otherwise. Thus, UFirst NY has not made a strong showing that it has superior rights to UFirst UT across the nation.

*       *       *

Absent a sufficient showing that UFirst adopted its trademark in bad faith or that UFirst NY has superior rights nation-wide, UFirst NY has not shown that it will ultimately prevail on its claim for a national permanent injunction. Because it has not satisfied the likelihood of success prong of the standard for a preliminary injunction, the court denies UFirst NY's request for a national injunction.

## II.    CLAIM FOR A UTAH INJUNCTION

UFirst NY also claims that it has the right to enjoin UFirst UT from using the UFirst trademark in Utah.[3] In order to show that it will ultimately prevail on this claim, UFirst NY must show that (1) UFirst UT adopted its new name in bad faith or (2) that UFirst NY established trademark rights in a market in Utah before UFirst UT established rights in the same market. *See*

---

[3] In its briefing, UFirst NY also discusses evidence of the number of members that moved to states surrounding Utah that UFirst NY categorized as the "Intermountain West." But other than emails sent to these members, UFirst NY has not produced evidence that it used its trademark in this region. Nor has UFirst NY argued that the Intermountain West constitutes a single cohesive market for the purposes of analyzing a remote user defense.

*GTE Corp. v. Williams*, 904 F.2d 536, 541 (10th Cir. 1990). As discussed above, UFirst NY has not made a strong showing that it will prevail on the issue of bad-faith adoption. This leaves the question of whether UFirst NY has shown that it established trademark rights in a Utah market before UFirst UT. In answering this question, the court first analyzes the appropriate legal standard to establish trademark rights. The court then applies this standard to the evidence presented to the court.

### A. Standard for Proving Market Penetration

UFirst NY argues that the standard for establishing trademark rights in a particular market is described in the following language from *Underwood v. Bank of America Corp.*:

> To establish actual use, "[t]he extent or duration of use is of no particular significance other than to the extent that it demonstrates [an] intention to adopt." *Drexel Enters., Inc. v. Richardson*, 312 F.2d 525, 527 (10th Cir. 1962). Even "a single use in trade may sustain trademarks rights if followed by continuous commercial utilization."

996 F.3d 1038, 1054 (10th Cir. 2021) (alterations in original) (citation omitted). Relying on this language, UFirst NY asserts that even a single use of its service mark in a Utah market is sufficient to block a junior user from using the mark in that market.

The court, however, disagrees with UFirst NY's reading of *Underwood*. In that case, the district court concluded that the plaintiffs did not own a protectable service mark because they had not used the mark in commerce. *Underwood v. Bank of Am. Corp.*, No. 1:18-cv-02329-RM-MEH, 2020 WL 616358, at *2 (D. Colo. Feb. 10, 2020). The question on appeal was whether the plaintiffs' act of launching an interactive chatbot on a publicly available website constituted a valid use in commerce sufficient to establish a protectable interest in service marks associated with the chatbot. *Underwood*, 996 F.3d at 1053. ("This appeal addresses only . . . whether Mr. Underwood

has a protectable interest in the E.R.I.C.A. and my24erica.com marks."). *Underwood*, notably, did not address the issue of the geographic reach of any service mark rights. Thus, the language from *Underwood* that UFirst NY relies on refers to the standard for establishing a protectable interest in a trademark or service mark through actual use in commerce. *Id.* ("The plaintiff's 'use of a mark in commerce . . . must be sufficient to establish *ownership rights* for a plaintiff to recover against subsequent users under section 43(a).'" (alteration in original) (citation omitted)).

The Tenth Circuit case quoted by *Underwood* further demonstrates that the standard for actual use described in that case does not apply to the question at issue here. In *Drexel Enters., Inc. v. Richardson*, 312 F.2d 525, 526 (10th Cir. 1962), the defendant argued that a trademark infringement claim failed because the plaintiff did not have a valid trademark. In the context of this contention, the *Drexel* court described the standard for establishing ownership of a mark through actual use:

> There must be a use of a trademark in order to give it validity. This actual use must be under circumstances which show that the user intends to adopt the mark or device as a trademark. The extent or duration of use is of no particular significance other than to the extent that it demonstrates this intention to adopt.

*Id.* at 527. Thus, the intention-to-adopt language used in *Drexel* and quoted in *Underwood* refers to the minimal standard for establishing ownership of a trademark or service mark through actual use.

Here, there is no dispute that UFirst NY established a protectable interest in its service mark through actual use in commerce. It has used the service mark within its membership territory in Upstate New York and Vermont since 2006. The question presented here is the geographic reach of UFirst NY's trademark rights. The extent of this territory is not determined by the single-use test advocated by UFirst NY. Instead, common law rights to an unregistered mark extend "to every

14

market where the trader's goods have become known and identified by his use of the mark." *Hanover Star Milling Co. v. Metcalf*, 240 U.S. 403, 416 (1916). In other words, "[t]he territorial scope of an unregistered mark is limited to the territory in which the mark is known and recognized by those in the defined group of potential customers." 5 J. THOMAS MCCARTHY, MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:2 (5th ed. 2023). Thus, "[e]stablishing priority of use . . . is not in and of itself sufficient to bestow common law trademark rights. To warrant immediate injunctive relief, [a plaintiff] must also establish sufficient market penetration in a specified geographic area." *Hanginout, Inc. v. Google, Inc.*, 54 F. Supp. 3d 1109, 1121 (S.D. Cal. 2014).

Many circuits apply the influential market penetration test outlined in the *National Footwear* case to determine whether a trademark owner has shown sufficient customer awareness of a trademark in a particular market to establish common-law rights for an unregistered mark:[4]

> [T]he following four factors should be considered to determine whether the market penetration of a trademark in an area is sufficient to warrant protection: (1) the volume of sales of the trademarked product; (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area.

---

[4] It appears that the Tenth Circuit has not yet had the opportunity to articulate a market penetration test. In two cases, that court upheld the lower court's finding that a senior user of an unregistered trademark failed to prove that it had established rights in a particular region before a junior user began using the mark in that region. *GTE*, 904 F.2d at 542; *Value House v. Phillips Mercantile Co.*, 523 F.2d 424, 431 (10th Cir. 1975). In both of those cases, however, the senior user had not conducted any business within the disputed region prior to the junior user. Where, as in this case, the senior user has presented evidence of at least some use of its trademark in the disputed region, the court must utilize a framework for determining the degree of market penetration required to establish rights in the region.

*Nat. Footwear Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1398–99 (3d Cir. 1985) (footnotes omitted); *accord Spartan Food Sys., Inc. v. HFS Corp.*, 813 F.2d 1279, 1283 (4th Cir. 1987); *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 574 (6th Cir. 2001); *Adray v. Adry-Mart, Inc.*, 76 F.3d 984, 989 (9th Cir. 1995); *see also Sweetarts v. Sunline, Inc.*, 380 F.2d 923, 929 (8th Cir. 1967) (applying a similar market penetration test). The court concludes that the *National Footwear* factors constitute the appropriate test for determining whether UFirst NY had established trademark rights in a Utah market before UFirst UT established rights in that market.

      *B.*     *The National Footwear Test*

          1)     Scope of Relevant Evidence of Use of the Service Mark

UFirst NY presented evidence that three of its members moved to Utah and used UFirst NY-branded services in the state. These three members lived in Utah during separate periods of time from 2012 through early 2022, when UFirst UT first began using the UFirst service mark in Utah. UFirst NY bases its claim to trademark rights in Utah on transactions that these three members made while in the state. It contends that the court should view the history of these transactions as a decade-long record of use of the UFirst service mark in Utah.

The court finds, however, that UFirst NY has not made a strong showing that it did not abandon any trademark rights it might have had prior to the date when Member Number Three moved to Utah in November 2021 and began to use UFirst NY-branded financial services. Member Number One used the UFirst NY service mark in Utah by making purchases with a debit card between October 2012 and December 2013, when he moved back to Plattsburgh, New York. Member Number Two moved to Utah in the summer of 2016. Her banking records do not indicate that she ever used a debit card in Utah. But she likely used a UFirst NY-branded card to withdraw

16

cash from an ATM in Utah on three occasions: once in June 2017, once in October 2017, and once in December of 2018. Thereafter, no one used UFirst NY's service mark in Utah until November 2021, when Member Number Three moved to the state and began to use a UFirst NY debit card to make purchases.

A trademark owner abandons its rights to a mark if "its use has been discontinued with intent not to resume such use. Intent not to resume may be inferred from circumstances." 15 U.S.C. § 1127. The evidence presented to the court shows that UFirst NY did not intend to resume use of its service mark in Utah after Member Two moved away from the state. It had no intent to advertise or expand operations to Utah because its membership field restrictions prohibited it from recruiting new members that did not have strong ties to five counties in Upstate New York and Vermont. Use of the mark in the Utah was mere happenstance resulting from an existing member's independent decision to move to the state and to continue using UFirst NY-branded services.

UFirst NY argues that its general intent to provide services to members when they travelled to regions outside of the five counties in New York and Vermont where it operates is sufficient to prove that it intended to resume use of its service mark in Utah. But a generic intent to provide services outside of its home region is not enough to prevent abandonment in every market throughout the United States. Otherwise, generalized intentions to grow or expand market share could always defeat an abandonment claim. Accordingly, the appropriate period of time to evaluate whether UFirst NY penetrated any market located in Utah is from November 13, 2021, when Member Three began to use the UFirst NY service mark in the state, and January 18, 2022, when

UFirst UT publicly announced its name change and launched an extensive rebranding campaign to inform its current members and potential customers of its new name.[5]

2)      Application of the *National Footwear* Test

The bank records provided by UFirst NY indicate that Member Three made the following transactions associated with the UFirst service mark between November 13, 2021 and January 18, 2023. First, he used a UFirst NY debit card 31 times to make point-of-sale purchases in Utah. To conduct these purchases, Member Three presumably either inserted his UFirst NY-branded debit card into a payment terminal or handed it to a cashier for processing. Member Three's records also indicate that he went to a shared branch on two occasions and used his debit card to withdraw cash from his account and to deposit a check. Finally, he used his debit card to withdraw money from an ATM on one occasion.[6]

This evidence of Member Three's use of the UFirst NY service mark in Utah falls far below the threshold of market penetration necessary to establish rights to an unregistered mark under the *National Footwear* factors. First, the volume of UFirst NY-branded transactions in Utah during the two-month period from November 13, 221 to January 18, 2022 is miniscule. The evidence shows that one person retrieved a UFirst NY debit card from his wallet a few times a week to make

---

[5] Even if UFirst NY had made a strong showing that it did not abandon any rights acquired prior to November 13, 2021, Member One's and Member Two's use of the service mark in Utah during 2012–2013 and 2017–2018 is slight in comparison to the size of the Utah market. This evidence would not alter the outcome of the court's market penetration analysis.

[6] Member Three's records also indicate that on about a dozen occasions he withdrew and deposited money from his account through a Venmo app. Although these withdrawals and deposits constitute financial services provided by UFirst NY, there is no evidence that the transactions involved the use of the UFirst service mark. The bank records also show that Member Three made payments towards his credit card bill two times. But again, UFirst NY did not provide evidence that these transactions constituted uses of the service mark rather than automatic payments.

a purchase or to retrieve money from a shared branch or ATM. Most of these transactions likely escaped the notice of all other Utah consumers. At most, a few cashiers and a credit union teller or two noticed the service mark on Member Three's debit card during these transactions. Accordingly, these transactions did little to nothing to associate the UFirst service mark with UFirst NY in the minds of Utah consumers. *See Nat. Footwear*, 760 F.2d at 1400 (holding that in states where total annual sales were below $5,000 to fewer than 50 customers, the total sales were so low that the plaintiff had not established rights in those states without analyzing the other three market penetration factors).

The second factor—growth trends (both positive and negative)—is neutral. During the two months that Member Number Three used his debit card in Utah, the frequency of his use neither increased nor decreased.

The third factor—the number of persons using UFirst NY's financial services compared to the number of potential customers in the market—weighs heavily against UFirst NY. The court takes judicial notice of the fact that the United States Census Bureau estimates that the population of Utah in 2022 was over 3.3 million.[7] Nearly all of the adults in the state utilize the financial services provided by banks and credit unions. One individual conducting a handful of UFirst NY-branded transactions over a two-month period compared to the number of potential customers in Utah demonstrates a statistically insignificant level of market penetration. *See Charles Jacquin Et*

---

[7] Because UFirst NY has not identified any smaller market within Utah in which it claims to have established trademark rights, the court analyzes its claim in relation to the entire state. Of course, courts are not required to analyze trademark rights at the state level. *See Nat. Footwear*, 760 F.2d at 1398 n.34; 5 McCarthy on Trademarks and Unfair Competition § 26:28 (observing that a great majority of courts have rejected the notion that the boundaries of a particular market are necessarily coextensive with state borders).

*Cie, Inc. v. Destileria Serralles, Inc.*, 921 F.2d 467, 474 (3d Cir. 1990) (reasoning that a three percent market share may be significant when weighing the *National Footwear* factors if no other competitor has more than a "few percent share").

Finally, the fourth factor—advertising—also weighs against a finding that UFirst NY had established rights in Utah. Because UFirst NY cannot accept new members who live in Utah, it does not advertise in the state. Thus, it did not conduct a marketing campaign to increase customer awareness of the UFirst NY service mark or associate the mark with UFirst NY in the minds of Utah consumers.

In sum, only the second *National Footwear* factor is neutral. The other three factors weigh strongly against finding that the largely invisible financial transactions of one individual over a two-month period were sufficient to generate any significant customer awareness of the UFirst NY service mark in Utah. Accordingly, UFirst NY has failed to make a strong showing that it will ultimately prove sufficient market penetration to establish service mark rights in Utah prior to UFirst UT.

     C.    *UFirst NY's Argument that Evidence of Consumer Confusion Is Sufficient to Establish Rights in Utah*

UFirst NY argues that *Dorpan, S.L. v. Hotel Melia, Inc.*, 728 F.3d 55 (1st Cir. 2013), supports its claim to rights in Utah. In *Dorpan*, a dispute arose regarding the geographic reach of a senior user's common law rights to an unregistered service mark. The senior user argued that its common law rights extended throughout Puerto Rico. *Id.* at 59. The junior user asserted that the senior user's rights were confined to the city of Ponce, where the senior user had operated a hotel for over a century, and that its use of the service mark in the name of a hotel located about 80 miles away did not infringe the senior user's common law rights. *Id.* at 58, 60. The district court granted

summary judgment in favor of the junior user, ruling that the senior user's rights to the unregistered mark were confined to Ponce. *Id.* at 60.

The First Circuit reversed the district court, holding that summary judgment in favor of the junior user was not warranted. In so doing, that court reasoned that evidence of customers' actual confusion regarding an affiliation between the senior user and the junior user of the mark was relevant to the inquiry regarding the extent of the senior user's common law rights:

> In this context, the geographic area in which an unregistered trademark is "in use" is defined as the area in which the use of similar mark would create a likelihood of confusion. Thus, in this case, the inquiry into the geographic scope of [the senior user's] pre-existing common law trademark rights and the likelihood of confusion analysis are one and the same.

*Id.* at 63–64. Professor McCarthy similarly noted that "[t]he touchstone of the determination of a trade area is likelihood of confusion. A trade area is the area in which people have associated a service mark with a particular business such that they would likely be confused by someone else's unauthorized use of the mark." 5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:27 (citation omitted).

In this case, UFirst NY presented evidence that some Utah consumers became confused when they conducted an internet search for UFirst UT's website or when they searched for the UFirst UT mobile app. Relying on *Dorpan*, UFirst NY contends that this evidence of consumer confusion on the internet proves that it has established trademark rights in Utah. The court disagrees. Of course, evidence that consumers in a particular market have become confused by a junior user's entry in the market can be persuasive evidence of market penetration on the part of the senior user. If the senior user's mark had not entered the consciousness of the consumers in a particular market, use of a similar mark on the part of a junior user would not cause confusion. But

21

evidence of confusion on the internet does not prove that consumers in Utah had become aware of UFirst NY's service mark. Indeed, outside of four or five UFirst NY members that had moved to the state, there is no evidence that anyone in Utah had ever heard of UFirst NY or knew that it operated a credit union in the area surrounding Plattsburg, New York. Instead, the evidence of confusion presented by UFirst NY is attributable to the fact that an internet search or app store search for "UFirst Credit Union" would yield results for both UFirst NY and UFirst UT. Such evidence of internet confusion, however, does not show that Utah consumers had any prior knowledge of UFirst NY's service mark.

In order to establish rights within a particular market, a senior user of an unregistered trademark must prove market penetration within that geographic market through prior use or advertising. Confusion resulting from the use of similar trademarks on the internet is not sufficient to prove that the owner of an unregistered mark with regional rights can enjoin a remote junior user of the mark just because they both use the internet:

> [M]erely because a Web site featuring a trademark can theoretically be accessed on computers from Florida to Alaska and from Beijing to Paris does not mean that the trademark is known and established in all those locations. Knowledge among persons in the territories in issue must be proven by evidence, not assumed just because the Internet is national and global.
>
> Merely being the senior user of a mark on the internet does not thereby create an exclusive right to the mark for internet use in all territories of the United States (or the world).

5 MCCARTHY ON TRADEMARKS AND UNFAIR COMPETITION § 26:30.50 (footnote omitted). Indeed, if confusion on the internet were a sufficient ground for injunctive relief, a senior user of an unregistered trademark could obtain de facto nationwide rights by being the first to use the mark on the internet, regardless of whether the senior user could prove market penetration. As discussed

above, use of a trademark on the internet is not enough to establish rights across the United States. *See, supra*, Part I.B.

In short, cases that rely on customer confusion as evidence of market penetration view confusion as proof of customer awareness of the senior user's mark within a specific geographic region. *Dorpan*, 728 F.3d at 63–64; *Food Fair Stores, Inc. v. Lakeland Grocery Corp.*, 301 F.2d 156, 162 (4th Cir. 1962) ("[P]rotection of a trade name may be given if persons residing in the area with knowledge of the trade name are likely to be confused by an infringement."). Because confusion caused by concurrent use of similar service marks on the internet does not indicate that consumers in Utah were aware of the UFirst NY mark, this type of confusion does not constitute strong evidence that it had penetrated any market located in Utah. *See Dudley v. Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 395 (W.D.N.Y. 2012) (ruling that confusion caused by the fact that an internet search yielded results for both the senior and junior users of a service mark "is not the type of confusion that the trademark laws are designed to prevent"); *cf. id.* at 394–95 (ruling that if two concurrent users of a service mark have rights to separate areas of the country, neither can exclude the other from using the internet); *Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 575 (6th Cir. 2001) (suggesting the same in dicta).

\*     \*     \*

For the above-stated reasons, the court finds that UFirst NY has not made a strong showing that it will ultimately prove that it had established service mark rights in Utah prior to UFirst UT. Because UFirst NY has not proven a likelihood of success on the merits, it is not entitled to a preliminary injunction against use of the service mark in Utah.

23

### III.     CLAIM FOR AN INJUNCTION IN THE NORTHEAST

UFirst NY also argues that it is entitled to an injunction "*at least* in the Northeast," which it defines as eight states: Connecticut, Massachusetts, Maine, New Hampshire, New Jersey, New York, Pennsylvania, and Vermont. Although UFirst UT does not advertise or maintain physical operations in this region, about 1,100 UFirst UT members have moved there. But the parties have not presented any evidence as to how many of these members continue to use UFirst UT's financial services. It is likely, however, that at some of them conduct transactions using UFirst UT's online tools or by making purchases with a UFirst UT debit card. Based on this evidence, UFirst NY argues that it is entitled to an injunction prohibiting UFirst UT's infringing use of its service mark in the Northeast.

But UFirst NY has not proven that UFirst UT has infringed its rights within this region. First, UFirst NY has not presented any evidence, much less strong evidence, that it owns the exclusive right to the UFirst service mark throughout the Northeast. Without any showing that UFirst NY has penetrated all of the markets contained within this expansive region through use of the unregistered service mark, it has not proven that it has enforceable rights to the entire Northeast. *See Emergency One, Inc. v. Am. Fire Eagle Engine Co.*, 332 F.3d 264, 269 (4th Cir. 2003) ("[T]he owner of common-law trademark rights in an unregistered mark is not entitled to injunctive relief in those localities where it has failed to establish actual use of the mark.").

Second, UFirst NY has not proven that UFirst UT has used the UFirst service mark in areas where UFirst NY has established common law rights. Because UFirst NY has operated within Clinton, Essex, and Franklin Counties of New York and Franklin and Grand Isle Counties of Vermont since 2006, the court presumes that UFirst NY has established exclusive rights to its service mark within these five counties. The evidence presented to the court indicates that one

24

UFirst UT member has relocated to this area by moving to Plattsburg, New York. But UFirst NY has not produced any evidence that this member has continued to use UFirst UT branded services within this region. Absent a strong showing of an infringing use of the service mark in a geographic area where UFirst NY has established exclusive rights to the mark, it has not proven a likelihood of success on the merits that would support a preliminary injunction.

Moreover, even if UFirst NY had produced evidence that a few UFirst UT members had used a debit card in the five counties where UFirst NY operates, it has not made a strong showing that such incidental uses of the service mark would warrant injunctive relief. "By allowing concurrent use of a mark, the trademark laws tolerate a certain amount of confusion." *Dudley v. Healthsource Chiropractic, Inc.*, 883 F. Supp. 2d 377, 394 (W.D.N.Y. 2012). Thus, "[g]eographic zones of exclusivity are not inviolate but must accommodate reasonable intrusion when it becomes impracticable to exclude another lawful user." *Id.* For example, a nearly national user of a trademark may employ a national ad campaign so long as it does not specifically target a competing trademark user's territory. *See Allard Enterprises, Inc. v. Advanced Programming Res., Inc.*, 249 F.3d 564, 575 (6th Cir. 2001) ("Courts have held in some cases that, despite a concurrent user with a territory of exclusive use, an almost-national user should be permitted some form of national advertising.").

As discussed above, *see supra*, Part II.B.2, use of a debit card by one or two individuals would not measurably affect service mark awareness within UFirst NY's home market in Upstate New York and Vermont. Moreover, ensuring that no UFirst UT member used a debit card or accessed its website while located in UFirst NY's territory would be difficult to accomplish. Thus, even if UFirst NY had produced evidence that some UFirst UT members had used the service mark

in a market where it had established exclusive rights, such incidental uses would not justify injunctive relief.

*     *     *

UFirst NY has not carried its burden of making a strong showing of likelihood of success on the merits for its claims for injunctive relief nationwide, in Utah or in the Northeast. Because it has not satisfied the first requirement for obtaining a preliminary injunction, the court need not address the other three requirements. The court denies UFirst NY's motion for a preliminary injunction.

## IV.   INJUNCTION BOND

The parties briefed the issue of whether the court should require UFirst NY to post a bond before issuing a preliminary injunction. UFirst UT argued that the court should require a $10 million bond. UFirst NY argued that the court should not require a bond, or if it does, a bond in the amount of $10,000. Because the court denies the motion for a preliminary injunction, the injunction bond issue is moot. But the court recognizes that UFirst NY may appeal this ruling. Therefore, the court addresses the injunction security issue for the benefit of the parties.

Under Rule 65(c) of the Federal Rules of Civil Procedure, "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." The Tenth Circuit has carved out two exceptions to the security requirement. First, "if there is an absence of proof showing a likelihood of harm, certainly no bond is necessary." *Cont'l Oil Co. v. Frontier Ref. Co.*, 338 F.2d 780, 782 (10th Cir. 1964). Second, if the defendant has ample assets to pay for any damages caused by the injunction, a court may decline to require a bond. *Id.* at 783.

26

Neither exception applies here. UFirst UT has presented evidence that it expended millions of dollars to develop and advertise its new trademark. If the court were to enjoin UFirst UT from using its new name, it will undoubtedly need to expend millions more to advertise a new name. Additionally, a rebrand so soon after UFirst UT changed its name would likely erode some of the credit union's good will. Given this evidence, the court finds that $10 million is a reasonable estimate of the damages UFirst UT would suffer if the court were to grant a preliminary injunction and later determine that injunctive relief was not warranted. Moreover, UFirst NY concedes that it does not have sufficient assets to pay for any damages caused for an erroneously granted preliminary injunction. Under these circumstances, the court would require a bond in the neighborhood of $10 million prior to granting an injunction that would effectively force UFirst to change its name.

## CONCLUSION

For the above-stated reasons, the court denies UFirst NY's motion for a preliminary injunction.

DATED September 27, 2023.

                              BY THE COURT

                              _____
                              Jill N. Parrish
                              United States District Court Judge